# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: INTRAMTA SWITCHED | § | |
| ACCESS CHARGES LITIGATION | § | |
| | § | Civil Action No. 3:14-MD-2587-D |
| | § | (MDL No. 2587) |
| | § | |
| THIS DOCUMENT RELATES TO | § | |
| CIVIL ACTION NOS. | § | |
| 3:14-CV-1724-D, 3:14-CV-3210-D, | § | |
| 3:14-CV-4418-D, 3:14-CV-4420-D, | § | |
| 3:14-CV-4422-D, 3:14-CV-4423-D, | § | |
| 3:14-CV-4424-D, 3:14-CV-4425-D, | § | |
| 3:14-CV-4426-D, 3:14-CV-4427-D, | § | |
| 3:14-CV-4428-D, 3:14-CV-4429-D, | § | |
| 3:14-CV-4430-D, 3:14-CV-4433-D, | § | |
| 3:14-CV-4445-D, 3:14-CV-4446-D, | § | |
| 3:14-CV-4447-D, 3:14-CV-4460-D, | § | |
| 3:14-CV-4469-D, 3:14-CV-4470-D, | § | |
| 3:14-CV-4472-D, 3:14-CV-4473-D, | § | |
| 3:14-CV-4474-D, 3:14-CV-4546-D, | § | |
| 3:14-CV-4547-D, 3:14-CV-4561-D, | § | |
| 3:14-CV-4564-D, 3:14-CV-4571-D, | § | |
| 3:14-CV-4572-D, 3:14-CV-4573-D, | § | |
| 3:14-CV-4574-D, 3:14-CV-4577-D, | § | |
| 3:14-CV-4579-D, 3:14-CV-4580-D, | § | |
| 3:14-CV-4581-D, 3:14-CV-4585-D, | § | |
| 3:15-CV-0019-D, 3:15-CV-0020-D, | § | |
| 3:15-CV-0021-D, 3:15-CV-0022-D, | § | |
| 3:15-CV-0023-D, 3:15-CV-0033-D, | § | |
| 3:15-CV-0034-D, 3:15-CV-0035-D, | § | |
| 3:15-CV-0036-D, 3:15-CV-0040-D, | § | |
| 3:15-CV-0044-D, 3:15-CV-0045-D, | § | |
| 3:15-CV-0047-D, 3:15-CV-0066-D, | § | |
| 3:15-CV-0078-D, 3:15-CV-0114-D, | § | |
| 3:15-CV-0115-D, 3:15-CV-0128-D, | § | |
| 3:15-CV-0134-D, 3:15-CV-0137-D, | § | |
| 3:15-CV-0142-D, 3:15-CV-0198-D, | § | |
| 3:15-CV-0228-D, 3:15-CV-0260-D, | § | |
| 3:15-CV-0301-D, 3:15-CV-0563-D, | § | |
| 3:15-CV-0705-D, 3:15-CV-0931-D, | § | |

3:15-CV-1040-D, 3:15-CV-1041-D,  §
3:15-CV-1052-D, 3:15-CV-1053-D,  §
3:15-CV-1069-D, 3:15-CV-1070-D,  §
3:15-CV-1071-D, 3:15-CV-1102-D,  §
3:15-CV-1177-D, and 3:15-CV-1179-D. §

## MEMORANDUM OPINION
### AND ORDER

In these MDL proceedings, defendants' joint motion to dismiss under Fed. R. Civ. P. 12(b)(6) principally presents the question whether local exchange carriers ("LECs") can charge interexchange carriers ("IXCs") access fees for access services that the LECs provide the IXCs to enable them to exchange interstate wireless intraMTA calls—that is, interstate wireless calls that originate and terminate within the same Major Trading Area ("MTA"). Concluding that they can under their filed federal tariffs, the court grants defendants' joint motion and dismisses plaintiffs' federal-law claims with prejudice. Concluding that plaintiffs have failed to plead plausible claims that the LEC defendants cannot charge access fees under filed state tariffs, the court grants defendants' joint motion, but it also grants plaintiffs leave to replead their state-law claims. Defendant AT&T Corp. ("AT&T") moves to dismiss or stay two of these cases, contending that the court should refer the central issues in dispute to the Federal Communications Commission ("FCC") under the doctrine of primary jurisdiction. Because there are no substantial issues for the FCC to decide, the court declines to make a referral to the FCC, and it denies AT&T's motion.

# I

Plaintiffs Sprint Communications Company L.P. ("Sprint") and MCI Communications Services, Inc. / Verizon Select Services Inc. ("Verizon") sue hundreds of LECs doing business throughout the United States, alleging that the LECs have charged and are continuing to charge IXCs access fees[1] on intraMTA wireless calls, in violation of FCC and court decisions that prohibit this practice for wireless intraMTA calls between Commercial Mobile Radio Service ("CMRS") carriers and LECs that originate and terminate within the same MTA.  Verizon Compl. ¶ 1.[2]  Sprint and Verizon bring claims under 47 U.S.C. §§ 206 and 207 for alleged violations of 47 U.S.C. §§ 201(b) and 203 for charging access fees on interstate intraMTA wireless calls; assert state-law breach of contract claims based on alleged breaches of tariffs governing interstate wireless intraMTA calls; and plead state-law breach of contract claims based on alleged breaches of tariffs governing intrastate wireless

---

[1]Plaintiffs' complaints refer to these fees as "switched access charges."  Because the briefing generally omits the term "switched," the court for convenience will likewise use the terms "access fees" or "access charges."

[2]Plaintiffs rely on the corrected first amended complaints in *Sprint Communications Co. v. Central Telephone Co. of Texas*, No. 3:14-CV-1724-D ("Sprint Complaint"), and *MCI Communications Services, Inc. v. Cameron Telephone Co.*, No. 3:14-CV-3210-D ("Verizon Complaint"), as representative of the complaints filed in all the pending cases.  The court will do so as well.

In deciding defendants' motions, the court construes plaintiffs' complaints in the light most favorable to them, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in their favor.  *See, e.g., Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).  "The court's review [of a Rule 12(b)(6) motion] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted).

intraMTA calls.  They essentially seek declaratory relief that they do not owe access fees, damages for fees they have paid in the past, and awards of other relief, such as attorney's fees.[3]

The Judicial Panel on Multidistrict Litigation transferred these cases to this court under 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings.  *See In re: IntraMTA Switched Access Charges Litig.*, 67 F.Supp.3d 1378 (J.P.M.L. 2014).  The month before the MDL proceedings were assigned to this court, several LECs filed with the FCC a Petition for Declaratory Ruling to Clarify the Applicability of the IntraMTA Rule to LEC-IXC Traffic ("FCC Petition").  The FCC Petition requests that the FCC confirm that plaintiffs owe access charges, rather than reciprocal compensation, when they use access services to originate or terminate calls, even if the calls are within the same MTA.  The FCC received public comment through March 11, 2015, and the FCC Petition remains pending.

In general terms,[4] LECs typically provide wireline (i.e., landline) local telephone company service to their customers.  They own or lease the equipment that is necessary to provide wireline telephone service within a specific geographical area, known as a "local exchange."  Wireline calls originating and terminating within the same local exchange are

---

[3]Sprint and Verizon are also suing each other's affiliated entities, because each is an IXC that has LEC affiliates.  In an April 20, 2015 order, the court clarified, consistent with a ruling it made at the initial scheduling conference, that Sprint and Verizon are not required at this time to file responsive pleadings to each other's complaints.

[4]A more detailed explanation of the background facts is unnecessary to understand the holdings and reasoning of this memorandum opinion and order.

considered "local" calls.

IXCs generally provide long distance services, delivering wireline calls between different local exchanges (i.e., interexchange calls). IXCs generally own only long distance facilities; they rely on LECs to originate and terminate long distance calls between end-users. IXCs pay LECs a fee—known as an "access charge"—to obtain access to the LEC's network. If a LEC customer places a long distance call, the LEC routes the call to the IXC selected by the customer, and the LEC charges the IXC an originating access charge. If the LEC receives a long distance call for termination that has been originated by another LEC's customer and delivered by an IXC—generally over "Feature Group D" facilities—the LEC charges the IXC a terminating access charge. LECs establish their access fees in filed tariffs. Rates for interstate long distance toll calls are filed with the FCC. Rates for intrastate long distance toll calls are filed with state public utility or public service commissions.

In 1996, Congress enacted the Telecommunications Act of 1996 (the "Telecommunications Act"), which brought competition to local telephone markets by requiring telephone companies to open their networks to competitors. Instead of access fees, LECs receive "reciprocal compensation" from other carriers for transporting and terminating traffic that originates on the network facilities of the other carriers. The rates for reciprocal compensation are set by the terms of interconnection agreements, and reciprocal compensation rates are typically much lower than access charges.[5] LECs often observe a

---

[5]The briefing and oral argument address why access fees are higher due to subsidies included in such fees.

"bill-and-keep" arrangement under which a LEC keeps its own local customers' fees, and does not charge the other LEC, when the volume of calls between them is roughly balanced.

For wireline calls, a local call is one that originates and terminates within a local calling area established by LECs in state tariffs or by state regulatory commissions. For wireless calls, a local call is one that originates and terminates within a single MTA, as defined by the FCC, that is, an intraMTA call. An MTA is typically much larger geographically than is a local calling area for wireline calls, and an MTA may encompass several states. Telecommunications traffic exchanged between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same MTA, is subject to reciprocal compensation. An intraMTA call can involve a wireline end-user as the originator or terminator of a call involving a wireless end-user. If an MTA encompasses more than one state, some intraMTA traffic within that MTA can be intrastate and other traffic interstate.

In these MDL proceedings, Sprint and Verizon—both IXCs—allege that the defendant LECs are not permitted to impose access fees on them for wireless intraMTA traffic. Almost all defendants jointly move to dismiss plaintiffs' actions under Rule 12(b)(6) for failure to state a claim.[6] Although not all defendants participating in the joint motion

---

[6]Defendants did not file their Rule 12(b)(6) motion on behalf of Verizon's LEC affiliates, Sprint, AT&T, or any defendants for which no counsel has yet filed a notice of appearance.

have joined all aspects of the motion,[7] most defendants contend that the filed tariff doctrine bars plaintiffs' claims; the FCC did not exempt plaintiffs from defendants' tariffs; if defendants' tariffs do not apply, then state contract law—the "voluntary payment doctrine"—bars plaintiffs' claims; plaintiffs have not alleged a violation of state law; the federal two-year statute of limitations applies to any state-law claims; and, in the alternative, the court should refer the issues to the FCC under the primary jurisdiction doctrine.  AT&T has not joined defendants' joint motion; it moves separately under Rule 12(b)(6) to dismiss or stay the two cases in which it is a defendant, contending that the court should refer the issues to the FCC under the doctrine of primary jurisdiction.  Three other defendants jointly move in a separate motion to dismiss under Rule 12(b)(1) based on tribal immunity. Plaintiffs oppose the motions.  The court has heard oral argument.[8]

II

Under Rule 12(b)(6), the court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).  To survive

---

[7]Certain defendants—the AT&T LECs, various Peerless Network entities, and the CenturyLink affiliates—have joined defendants' joint motion but have filed notices that they do not join specific arguments asserted in the joint motion. None of these notices, however, relates to a ground on which the court is relying to grant defendants' joint motion.

[8]The Rule 12(b)(1) motion to dismiss that is based on tribal immunity was not orally argued, and it is decided today in a separate memorandum opinion and order.

defendants' motions, plaintiffs' complaints must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (brackets omitted) (quoting Rule 8(a)(2)). Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "'labels and conclusions.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And "'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

III

The court turns first to defendants' contention that plaintiffs' federal-law claims are barred by the filed rate doctrine.

A

Defendants posit that plaintiffs' claims fail because, based on the facts pleaded, the filed rate doctrine requires plaintiffs to pay the access charges specified in defendants' tariffs filed with the FCC, and it bars any claim or theory that has the effect of causing plaintiffs to pay less than the full tariffed amounts.

Plaintiffs respond that, "[f]irst and foremost, the filed tariff defense rises and falls on whether the intraMTA rule bars access charges on intraMTA traffic." Ps. Resp. 36. They maintain that a filed tariff cannot be enforced when it is contrary to law, and that, for the reasons they have otherwise presented in their briefing, LECs cannot lawfully charge access fees on intraMTA traffic. Second, plaintiffs posit that defendants' reliance on the filed rate doctrine is misplaced because the traffic at issue does not involve access services as described in defendants' tariffs, since the tariffed access charges are inapplicable to intraMTA traffic. Third, plaintiffs assert that defendants have not met their burden of demonstrating that their tariffs apply to the charges at issue in the complaints because they have not, for example, presented their tariffs to the court.

B

"[T]he 'filed rate doctrine['] . . . forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) (citations omitted). The doctrine exists because "[i]t would undermine the congressional scheme of uniform rate regulation to allow a[] court to award as damages a rate never filed with the [regulatory agency] and thus never

found to be reasonable within the meaning of the Act." *Id.* at 579. "[T]he rate of the carrier duly filed is the only lawful charge [and d]eviation from it is not permitted upon any pretext." *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97 (1915).

Under the filed rate doctrine, "any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 508 (5th Cir. 2005) (some internal quotation marks omitted). Accordingly, "once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000) (quoting *Marcus v. A T & T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998)). "Not only is a carrier forbidden from charging rates other than as set out in its filed tariff, but customers . . . may not bring an action against a carrier that would invalidate, alter or add to the terms of the filed tariff." *Id.* (citations omitted).

"Under the filed-rate doctrine, federal law preempts claims concerning the price at which service is to be offered, and . . . claims concerning the services that are offered." *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 711 (5th Cir. 1999) (citing *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 220-26 (1998)).

IV

Plaintiffs first challenge defendants' reliance on the filed rate doctrine on the ground that a filed tariff cannot be enforced when it is contrary to law, and that the LECs cannot lawfully charge access fees on intraMTA traffic.

A

Following divestiture in the telecommunications industry in the 1980s, and at the time the Telecommunications Act was enacted in 1996, LECs were permitted to charge IXCs access fees for providing access service. In 1996, FCC regulations defined "[a]ccess service" as "services and facilities provided for the origination or termination of any interstate or foreign telecommunication." 47 C.F.R. § 69.2(b) (1996). Section 69.5(b) provided that "[c]arrier's carrier charges shall be computed and assessed upon all [IXCs] that use local exchange switching facilities for the provision of interstate or foreign telecommunications services." 47 C.F.R. § 69.5(b) (1996).

The Telecommunications Act leaves in place the access charge regime between LECs and IXCs. Concerning LECs's obligations to other carriers and providers, including IXCs, the Act explicitly provides:

> On and after February 8, 1996, each [LEC], to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to [IXCs] and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (*including receipt of compensation*) that apply to such carrier on the date immediately preceding February 8, 1996, under any court order, consent decree, or regulation, order, or policy of the [FCC], *until such restrictions*

> *and obligations are explicitly superseded by regulations prescribed by the [FCC] after February 8, 1996*.  During the period beginning on February 8, 1996, and *until such restrictions and obligations are so superseded*, such restrictions and obligations shall be enforceable in the same manner as regulations of the [FCC].

47 U.S.C. § 251(g) (emphasis added).   The Telecommunications Act thus preserves the restrictions and obligations concerning LECs—"including receipt of compensation"—until later explicitly superseded by FCC regulations.  *Id.*; *see, e.g., Atlas Tel. Co. v. Okla. Corp. Comm'n*, 400 F.3d 1256, 1263 (10th Cir. 2005) (citing D.C. Circuit's explanation that "§ 251(g) is a transitional provision designed to keep in place certain restrictions and obligations*, including the existing access charge regime*, until such provisions are superceded by FCC regulations." (emphasis added) (citing *WorldCom, Inc. v. FCC*, 288 F.3d 429, 432-33 (D.C. Cir. 2002))).

Plaintiffs' challenge to defendants' invocation of the filed rate doctrine thus turns on whether the FCC has by regulation *explicitly superseded* the pertinent compensation scheme that was the existing practice at the time the Telecommunications Act was enacted.  Stated another way, the question is whether the right of LECs to impose access fees on IXCs for access services that enable the IXCs to exchange interstate wireless intraMTA calls is still governed by the compensation practice in effect when the Telecommunications Act took effect in 1996, or is now prohibited by an FCC regulation promulgated thereafter.

B

Plaintiffs contend that the FCC's order in *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Interconnection Between Local Exchange Carriers and Commercial Mobile Radio Service Providers*, First Report and Order, 11 F.C.C.R. 15499 (Aug. 8, 1996) ("Local Competition Order"), prohibits LECs from imposing access charges on intraMTA traffic.  The court disagrees.

Nothing in the Local Competition Order explicitly supersedes the existing practice regarding access charges that LECs assess IXCs.  Although the Local Competition Order requires LECs "to enter into reciprocal compensation arrangements *with CMRS providers* . . . for the transport and termination of traffic on each other's networks," Local Competition Order, 11 F.C.C.R. at 15517, ¶ 34 (emphasis added), nothing obligates LECs to enter into the same arrangements with IXCs.  Significantly, ¶ 30 of the Local Competition Order acknowledges that "[n]othing in this Report and Order alters the collection of access charges paid by an [IXC] *under Part 69 of the Commission's rules*, when the incumbent LEC provides exchange access service to an [IXC], either directly or through service resale." *Id.* at 15515-16, ¶ 30 (emphasis added).  47 C.F.R. §§ 69.2(b) and 69.5(b) are included in Part 69.  As the district court stated in a case that is now part of these MDL proceedings:

> the 1996 *Local Competition Order* distinguishes between service arrangements between LECs and CMRS providers and service arrangements between LECs and IXCs, and did *not* apply its conclusion that service arrangements involving intraMTA traffic between CMRS providers and LECs are subject to reciprocal compensation, not access charges, to service arrangements involving such traffic between LECs and

IXCs.

*Sprint Commc'ns Co. v. Butler-Bremer Mut. Tel. Co.*, 2014 WL 4980539, at *4 (N.D. Iowa

Oct. 6, 2014) (citation omitted).

Another part of the Local Competition Order—which addresses "CMRS-Related

Issues"—also supports this reading.   After two paragraphs that explain that a LEC's

obligation under § 251(b)(5) to establish reciprocal compensation arrangements applies to

all local traffic transmitted with CMRS providers, and that, under § 251(b)(5), a LEC cannot

charge a CMRS provider or other carrier for terminating LEC-originated traffic, the order

states in ¶ 1043, in pertinent part:

> We reiterate that traffic between an incumbent LEC and a
> CMRS network that originates and terminates within the same
> MTA (defined based on the parties' locations at the beginning
> of the call) is subject to transport and termination rates under
> section 251(b)(5), rather than interstate or intrastate access
> charges. *Under our existing practice, most traffic between LECs
> and CMRS providers is not subject to interstate access charges
> unless it is carried by an IXC*, with the exception of certain
> interstate interexchange service provided by CMRS carriers,
> such as some "roaming" traffic that transits incumbent LECs'
> switching facilities, which is subject to interstate access charges.
> Based on our authority under section 251(g) to preserve the
> current interstate access charge regime, we conclude that the
> new transport and termination rules should be applied to LECs
> and CMRS providers so that CMRS providers continue not to
> pay interstate access charges for traffic that currently is not
> subject to such charges, and are assessed such charges for traffic
> that is currently subject to interstate access charges.

Local Competition Order, 11 F.C.C.R. at 16016-17, ¶ 1043 (emphasis added) (footnotes

omitted).   Stated differently, under the "existing practice"—which the Local Competition

Order does not change—access charges *are* owed when an IXC carries interstate wireless traffic.

The FCC reaffirmed this position in *In re TSR Wireless, LLC* (*TSR Wireless, LLC v. U S West Commc'ns, Inc.*), 15 F.C.C.R. 11166 (June 21, 2000) ("TSR Wireless"):

> Section 51.703(b) concerns how carriers must compensate each other for the transport and termination of calls.  It does not address the charges that carriers may impose upon their end users.  Section 51.703(b), when read in conjunction with Section 51.701(b)(2), requires LECs to deliver, without charge, traffic to CMRS providers anywhere within the MTA in which the call originated, with the exception of RBOCs, which are generally prohibited from delivering traffic across LATA boundaries.  MTAs typically are large areas that may encompass multiple LATAs, and often cross state boundaries.  Pursuant to Section 51.703(b), a LEC may not charge CMRS providers for facilities used to deliver LEC-originated traffic that originates and terminates within the same MTA, as this constitutes local traffic under our rules.  *Such traffic falls under our reciprocal compensation rules if carried by the incumbent LEC, and under our access charge rules if carried by an interexchange carrier.*

TSR Wireless, 15 F.C.C.R. at 11184, ¶ 31 (emphasis added) (footnotes omitted).  The italicized sentence is footnoted with a citation to the pages of the Local Competition Order that contain footnote 1043.  *Id.* at ¶ 31 n.105.

Plaintiffs also rely on the Local Competition Order to argue that the FCC prohibits LECs from imposing access charges on all wireless intraMTA traffic, which would include wireless intraMTA traffic carried by an IXC as an intermediate carrier.  They cite ¶ 1036 of the Local Competition Order, contending that traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates

under § 251(b)(5) rather than interstate and intrastate access charges.  But ¶ 1036 simply sets out the intraMTA rule; it does not mention IXCs, much less explicitly supersede the existing access charge regime between LECs and IXCs.  Nor is plaintiffs' reading of ¶ 1036 reasonable given the FCC's statement that it is defining "the local service area for calls to or from a CMRS network *for the purposes of applying reciprocal compensation obligations under section 251(b)(5)*," Local Competition Order, 11 F.C.C.R. at 16014, ¶ 1036 (emphasis added), and its clarification in ¶ 1034 that "the reciprocal compensation provisions of section 251(b)(5) for transport and termination of traffic *do not apply to the transport or termination of interstate or intrastate interexchange* traffic," *id.* at 16013, ¶ 1034 (emphasis added). Moreover, plaintiffs' reading of ¶ 1036 cannot be reconciled with the FCC's statement in ¶ 30 that the Local Competition Order does not alter the collection of access charges paid by an IXC under Part 69 of the FCC's rules, which includes 47 C.F.R. § 69.5(b).

## C

Plaintiffs also rely on 47 C.F.R. § 51.703(b), which provides: "A LEC may not assess charges on any other telecommunications carrier for Non-Access Telecommunications Traffic that originates on the LEC's network."[9]  Plaintiffs contend that § 51.703(b) prohibits LECs entirely from assessing charges on "any other telecommunications carrier" for intraMTA wireless traffic that originates on the LEC's network.  Ps. Resp. 9 (quoting

---

[9]The 1996 version of the rule is substantively identical to the current version, but uses the term "local telecommunications traffic" instead of "Non-Access Telecommunications Traffic."

§ 51.703(b)).  They cite ¶ 1042 of the Local Competition Order[10] for the proposition that this

prohibition applies to a CMRS provider and to an intermediate carrier, like an IXC.  The

court disagrees.

Section 51.703(b) is part of Subpart H of Part 51 (Interconnection) of the FCC

Regulations.  Subpart H is entitled "Reciprocal Compensation for Transport and Termination

of Telecommunications Traffic."  Reciprocal compensation is distinct from access fees.

Moreover, § 51.701(a) states, in pertinent part, that the provisions of Subpart H apply

to "Non-Access Reciprocal Compensation for transport and termination of Non-Access

Telecommunications Traffic between LECs and other telecommunications carriers." Section

51.701(b) provides that "Non-Access Telecommunications Traffic" means:

---

[10]Paragraph 1042 provides:

> We conclude that, pursuant to section 251(b)(5), a LEC may not
> charge a CMRS provider or other carrier for terminating
> LEC-originated traffic. Section 251(b)(5) specifies that LECs
> and interconnecting carriers shall compensate one another for
> termination of traffic on a reciprocal basis.  This section does
> not address charges payable to a carrier that originates traffic.
> We therefore conclude that section 251(b)(5) prohibits charges
> such as those some incumbent LECs currently impose on CMRS
> providers for LEC-originated traffic.  As of the effective date of
> this order, a LEC must cease charging a CMRS provider or
> other carrier for terminating LEC-originated traffic and must
> provide that traffic to the CMRS provider or other carrier
> without charge.

Local Competition Order, 11 F.C.C.R. at 16016, ¶ 1042.

> (1) Telecommunications traffic exchanged between a LEC and a telecommunications carrier other than a CMRS provider, *except for telecommunications traffic that is interstate or intrastate exchange access*, information access, or exchange services for such access; or
>
> (2) Telecommunications traffic exchanged between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same [MTA], as defined in § 24.202(a) of this chapter.

47 C.F.R. § 51.701(b) (emphasis added).  Plaintiffs are therefore relying on provisions that govern *reciprocal compensation* and *non-access* traffic, neither of which applies to an IXC.

As the Ninth Circuit explained in *Western Radio Services Co. v. Qwest Corp.*, 678 F.3d 970 (9th Cir. 2012), traffic carried by an IXC is access-based rather than reciprocal-compensation-based.

> [I]n the regulation addressing the scope of the transport and termination pricing rules, the FCC distinguishes between traffic exchanged between a LEC and a CMRS provider and traffic exchanged between a LEC and a non-CMRS provider.  *See* 47 C.F.R. § 51.701(b).   In the former situation, reciprocal compensation applies to all traffic exchanged "that, at the beginning of the call, originates and terminates within the same Major Trading Area . . . ."  *Id.* § 51.701(b)(2).  In the latter situation, reciprocal compensation applies to all traffic exchanged *except* "telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access . . . ."  *Id.* § 51.701(b)(1).  *Traffic carried by an IXC, which is access-based rather than reciprocal-compensation-based, falls within this regulatory exception to the reciprocal compensation rules*.

*Id.* at 988 (second emphasis added) (citation omitted).  Plaintiffs' reliance on § 51.703(b) is therefore misplaced.

- 18 -

D

Plaintiffs also rely on certain federal cases decided between 2003 and 2012 to argue that access charges do not apply to wireless intraMTA traffic.  But this reliance is misplaced, because none of these decisions addresses whether a LEC is permitted to charge an IXC access fees for providing access services that enable the IXC to exchange interstate wireless intraMTA traffic.  *See Sprint Commc'ns Co.*, 2014 WL 4980539, at *4 ("the federal appellate decisions on which Sprint relies [including those discussed below] also *do not* involve interpretation or policy analysis of FCC regulations regarding payment arrangements between LECs and IXCs.").

For example, in *Atlas* the Tenth Circuit addressed a dispute between rural LECs and CMRS providers regarding whether the LECs were obligated to enter into reciprocal compensation agreements *with the CMRS providers* for intraMTA calls delivered via an intermediate carrier.  *Atlas*, 400 F.3d at 1259, 1261.  The court held that the plaintiff LECs "ha[d] a mandatory duty to establish reciprocal compensation agreements *with the CMRS providers* . . . for calls originating and terminating within the same MTA," and that nothing in the FCC regulations provided "support for the [LECs's] contention that reciprocal compensation requirements do not apply when traffic is transported on an IXC network." *Id*. at 1264 (emphasis added).  The Tenth Circuit did not address or decide the question presented in these MDL proceedings: whether LECs are permitted to charge *IXCs* access fees for exchanging interstate wireless intraMTA traffic.

Similarly, in *Alma Communications Co. v. Missouri Public Service Commission*, 490

F.3d 619 (8th Cir. 2007), the Eighth Circuit addressed whether a "[LEC] *and the cell-phone provider* must share 'reciprocal compensation'" for landline telephone calls to cellular phones within the same MTA, even when such calls were routed through a long distance provider. *Id.* at 620 (emphasis added). The court did not address whether the LEC could charge *the IXC* access charges.

And in *Western Radio Services* the Ninth Circuit concluded that the application of access charges "to calls exchanged between a CMRS provider and a LEC," when those calls are carried by an IXC, violated the Telecommunications Act, but the court explicitly noted that "[t]raffic carried by an IXC, which is access-based rather than reciprocal-compensation-based, falls within this *regulatory exception* to the reciprocal compensation rules." *W. Radio Servs.*, 678 F.3d at 973, 988 (emphasis added).

Plaintiffs also rely on *Iowa Network Services, Inc. v. Qwest Corp.*, 466 F.3d 1091 (8th Cir. 2006) ("*INS II*"), in which the Eighth Circuit agreed that the FCC's reciprocal compensation rules do not directly address intermediary compensation, and upheld, as not inconsistent with federal law, the district court's conclusion that Qwest, an intermediary carrier, "need not pay access charges because access charges are not available for 'local' traffic." *Id.* at 1096. Key to the district court's conclusion, however, was the fact that Qwest was acting as an "intermediate" or "transiting" carrier, *not as an IXC*. The district court explained that "[t]he regulatory classification of Qwest is, however, pertinent *as there exists within the reciprocal compensation rules an exception for IXCs*." *Iowa Network Servs., Inc. v. Qwest Corp.*, 385 F.Supp.2d 850, 871 (S.D. Iowa 2005) (emphasis added), *aff'd*, 466 F.3d

1091 (8th Cir. 2006).

Finally, plaintiffs' reliance on *Rural Iowa Independent Telephone Ass'n v. Iowa Utilities Board*, 476 F.3d 572 (8th Cir. 2007), is similarly misplaced because it also dealt with Qwest, who was not acting as an IXC.  Instead, Qwest was "act[ing] as a conduit to facilitate what is essentially a transaction between a wireless carrier and a local exchange carrier." *Id.* at 577.  Moreover, the Eighth Circuit noted that the LEC's practice of requiring that its customers dial a "0" or "1" at the beginning of an intraMTA wireless call resulted in the calls' "be[ing] carried by an IXC *and subject to access charges*." *Id.* at 578 (emphasis added).

In sum, none of the court decisions on which plaintiffs rely supports their position that LECs are precluded by FCC rules from charging IXCs access fees for access services that they provide the IXCs to enable them to exchange interstate wireless intraMTA calls.

E

Plaintiffs contend that in *In re Connect America Fund, A National Broadband Plan for Our Future*, Report and Order and Further Notice of Proposed Rule-Making, 26 F.C.C.R. 17663 (Nov. 18, 2011) ("Connect America Order"), the FCC "define[d] the compensation regime for intraMTA wireless traffic with reference to the origin and termination of the traffic, not by the identity of the carriers involved in transporting that traffic."  Ps. Resp. 17.  Plaintiffs rely on ¶ 41, which contains the following sentence: "we affirm that all traffic routed to or from a CMRS provider that, at the beginning of a call, originates and terminates within the same MTA, is subject to reciprocal compensation, *without exception*."  Connect

- 21 -

America Order, 26 F.C.C.R. at 17678, ¶ 41 (emphasis added).  Plaintiffs also cite ¶ 1007, which states:

> In a further pending dispute, some LECs have argued that if completing a call to a CMRS provider requires a LEC to route the call to an intermediary carrier outside the LEC's local calling area, the call is subject to access charges, not reciprocal compensation, even if the call originates and terminates within the same MTA.  One commenter in this proceeding asks us to affirm that such traffic is subject to reciprocal compensation. We therefore clarify that the intraMTA rule means that all traffic exchanged between a LEC and a CMRS provider that originates and terminates within the same MTA, as determined at the time the call is initiated, is subject to reciprocal compensation regardless of whether or not the call is, prior to termination, routed to a point located outside that MTA or outside the local calling area of the LEC.  Similarly, intraMTA traffic is subject to reciprocal compensation regardless of whether the two end carriers are directly connected or exchange traffic indirectly via a transit carrier.

*Id.* at 18042-43, ¶ 1007.  According to plaintiffs, the FCC's use of the word "traffic," as opposed to framing the issue as whether LECs or CMRS providers may impose access charges *on one another* for intraMTA calls, evidences a "square[] reject[ion]" of the LECs's position regarding access charges on IXCs. Ps. Resp. 17-18.  They argue that, by citing *Alma*, 490 F.3d 619, *INS II*, 466 F.3d 1091, and *Atlas*, 400 F.3d 1256, in footnote 2133 of the Connect America Order, the "FCC left no doubt that LECs cannot impose access charges on intraMTA traffic, regardless of which carriers transport it."  Ps. Resp. 18.

Plaintiffs' reliance on the single sentence they quote from ¶ 41 lacks force.  The Connect America Order does not expressly apply to compensation between a LEC and an IXC for intraMTA calls.  *See Sprint Commc'ns Co.*, 2014 WL 4980539, at *4 ("Likewise,

the [Connect America Order] only 'clarified' payment arrangements between LECs and CMRS providers, but did not address payment arrangements between LECs and IXCs."). And although ¶ 41 does contain the sentence on which plaintiffs rely—"we affirm that all traffic routed to or from a CMRS provider that, at the beginning of a call, originates and terminates within the same MTA, is subject to reciprocal compensation, *without exception,*" *id.* (emphasis added)—the sentence must be read in context. Paragraph 41, as a whole, is addressed to "*CMRS-Local Exchange Carrier (LEC) Compensation.*" Connect America Order, 26 F.C.C.R. at 17678, ¶ 41 (italics in original). And the final sentence of ¶ 41—the sentence on which plaintiffs rely—is preceded by five other sentences, including the following three that place the final sentence in context:

> We clarify certain aspects of *CMRS-LEC* compensation to reduce disputes and address existing ambiguity. We adopt bill-and-keep as the default methodology for all *non-access CMRS-LEC* traffic. To provide rate-of-return LECs time to adjust to bill-and-keep, we adopt an interim transport rule for rate-of-return carriers to specify LEC transport obligations under the default bill-and-keep framework for *non-access* traffic exchanged between *these carriers*.

Connect America Order, 26 F.C.C.R. at 17678, ¶ 41 (emphasis added). It is therefore apparent that when the FCC affirmed, without exception, that all traffic routed to or from a CMRS provider that, at the beginning of a call, originates and terminates within the same MTA is subject to reciprocal compensation, it was referring to compensation between a CMRS and a LEC. Paragraph 41 does not mention other carriers that might be involved in exchanging such traffic. It does not address IXCs or any aspect of the compensation

- 23 -

permitted between LECs and IXCs.  Nor does ¶ 1007, on which plaintiffs also rely, address

compensation between LECs and IXCs.  *See W. Radio Servs.*, 678 F.3d at 989 ("Further, we

note that the FCC has issued a new report and order, effective December 29, 2011, that cites

this case law approvingly and clarifies that *in the LEC-CMRS context*, this is indeed how the

reciprocal compensation rules are to operate." (emphasis added)).

F

Under 47 U.S.C. § 251(g), the proper methodology for determining whether LECs can

charge IXCs for the access services at issue is to identify the baseline practice on the date

immediately preceding February 8, 1996 and then determine whether the FCC by regulation

has *explicitly superseded* that practice.  Defendants have established that the FCC has not yet

explicitly superseded the baseline compensation practices that applied on the date

immediately preceding February 8, 1996  to the access services that LECs provide IXCs to

enable them to exchange interstate wireless intraMTA calls.  And plaintiffs have failed to

show otherwise.

Plaintiffs have pointed to no FCC regulation that explicitly supersedes the authority

of LECs to impose such access fees.  The Local Competition Order does not explicitly

address the LEC-IXC compensation regime.  And the order explicitly states that it is not

altering the collection of access charges paid by an IXC under Part 69 of the FCC's rules

when the incumbent LEC provides exchange access service to an IXC, directly or through

service resale.  Nor does the Connect America Order explicitly address whether a LEC can

charge an IXC access fees for the access services at issue.  And to the extent plaintiffs

attempt to identify statements in court opinions to establish that LECs cannot charge IXCs access fees for access services provided on intraMTA calls, none of the decisions on which they rely is squarely on point.

Plaintiffs essentially attempt to undercut defendants' reliance on the filed rate doctrine, and establish that access fees are unlawful, by citing snippets they have pulled from FCC orders and relying on the reasoning of court opinions that do not decide the question. The fundamental fallacy in this approach should be apparent. If plaintiffs are relegated to attempting to divine Delphic clues from FCC orders, compelled to cobble together a series of excerpts from these orders, and forced to rely on court opinions that do not decide the question, to maintain that they together establish that access fees are now unlawful, this means the FCC has *not* yet by regulation *explicitly superseded* the relevant pre-February 8, 1996 baseline compensation practices. Indeed, plaintiffs' approach is in a sense somewhat akin to attempting to prove a case through circumstantial evidence. But while circumstantial evidence can appropriately be relied on when proving facts at trial, it is no substitute for proof of explicit regulation by the FCC.

Given the FCC's efforts to promote wireless communications, and the literal explosion of wireless communication devices, the reciprocal compensation regime for which plaintiffs argue may be the way of the near future. But today, the question is whether the FCC has by regulation explicitly superseded the pre-February 8, 1996 statutory baseline that governs how access fees are charged for access services that LECs provide IXCs to enable them to exchange interstate wireless intraMTA calls. And the answer is, it has not.

- 25 -

V

Although plaintiffs principally oppose defendants' reliance on the filed rate doctrine on the ground that the tariffs are contrary to law, they also rely on two other arguments.

Plaintiffs posit that the filed tariff defense is inapposite because the traffic at issue does not involve access services as described in defendants' tariffs, since they are transporting intraMTA traffic, which is not such a service. Because the court has concluded above that the services at issue are subject to access fees, this basis for plaintiffs' opposition necessarily fails as well.

Plaintiffs also contend that defendants have not met their burden of demonstrating that their tariffs apply to the charges at issue in the complaint because they have not, for example, presented their tariffs to the court. This argument is refuted by plaintiffs' complaints. Plaintiffs allege that defendants bill originating and terminating switched access charges on interstate wireless intraMTA calls; that defendants' interstate access tariffs do not explicitly exempt wireless intraMTA calls; and that defendants' tariffs "apply by their terms to wireless intraMTA calls," Verizon Compl. ¶ 62.[11] Because plaintiffs have specifically alleged that defendants' tariffs apply to the charges at issue, it is unnecessary for defendants to present their tariffs to the court.

---

[11]*See supra* note 2 for the source of this reference to Verizon's complaint.

VI

The court now turns to defendants' contentions that plaintiffs have failed to plead state-law claims on which relief can be granted.

A

Plaintiffs allege claims for breach of contract based on defendants' practice of charging IXCs access charges, via tariffs filed with state public utilities commissions, for access services relating to intrastate wireless intraMTA calls. Defendants move to dismiss plaintiffs' state-law claims, contending that plaintiffs admit that the access charges they paid were described in defendants' tariffs, and that they do not allege that the services they ordered and received were not as described in any tariffs; that plaintiffs do not cite any *state* law that prohibits defendants from collecting access charges for plaintiffs' use of access services to exchange intrastate intraMTA calls; that plaintiffs' state-law claims for breach of the state-filed tariffs fail to detail how, if at all, defendants breached any obligations described in the tariffs; and that, to the extent plaintiffs contend that *federal* law prohibits LECs from charging IXCs access fees for access services related to intraMTA calls, federal law preempts all state laws on the issue.

Plaintiffs respond that they are not required at the motion to dismiss stage to detail how defendants breached their tariffs or to attach copies of the hundreds of tariffs defendants allegedly breached; that a number of defendants' tariffs expressly prohibit access charges on intraMTA traffic; that even where defendants' tariffs do not expressly prohibit access

- 27 -

charges on intraMTA traffic, the tariffs must be interpreted to incorporate the relevant state and/or federal laws prohibiting this conduct, and that a number of states have state intraMTA rules apart from federal law; that even in those states that have not expressly enacted a state intraMTA rule, the tariffs still must incorporate the federal intraMTA rule for interstate and intrastate intraMTA traffic; and that defendants are incorrect that all of the state-law breach of contract claims are entirely preempted by federal law.

B

The court concludes that plaintiffs have failed to plead facially plausible state-law claims on which relief can be granted.  To the extent plaintiffs challenge defendants' filed state tariffs on the basis that federal law prohibits access charges, the court has already concluded above that such charges are permissible under federal law.

To the extent plaintiffs intend to challenge defendants' filed state tariffs on the basis that they are prohibited under state law, plaintiffs have not plausibly pleaded any state laws that prohibit these charges.  Although they cite examples of such state laws in their response, *see* Ps. Resp. 48,[12] the complaints themselves are vague and conclusory, without any reference to a specific state law that prohibits LECs from charging IXCs access charges on

---

[12]Plaintiffs argue in their response that a number of states have state intraMTA rules apart from the federal law, citing examples from Ohio, Montana, Texas, South Dakota, and Missouri. Ps. Resp. 48.  But the examples plaintiffs cite are state intraMTA rules that largely copy the language used in the federal statutes and regulations that the court has discussed above; none appears to prohibit LECs—to a greater extent than do the federal statutes and regulations after which they are modeled—from charging access fees when IXCs exchange intrastate intraMTA calls.

intrastate intraMTA calls.

Finally, to the extent plaintiffs argue that the state tariffs themselves do not allow access charges for intrastate intraMTA calls, they have not plausibly pleaded that defendants' charges for these types of calls violate the filed state tariffs. Even if plaintiffs are not required to attach to their complaints copies of the hundreds of tariffs at issue, they are required to plausibly plead that the filed state tariffs do not allow access charges on intraMTA calls, which they have not done.[13] In support of their state-law claims, plaintiffs allege the following:

> Defendants' intrastate switched access tariffs on file with the State Commission constitute contracts between Defendants and any purchaser of services from those tariffs, which includes Verizon.

> Defendants have charged, and continue to charge, Verizon switched access charges on wireless intraMTA calls that do not qualify for such charges, in violation of their respective intrastate access tariffs.

> Defendants are in breach of their respective state tariff provisions when they bill Verizon for wireless intraMTA calls, as they do not qualify for such charges. To the extent the tariffs purport to allow such charges, they are unenforceable.

---

[13]In their response, plaintiffs provide examples of three filed state tariffs that they argue prohibit LECs from charging IXCs access charges on intrastate intraMTA calls. But in some of these examples, the tariffs do not go further than incorporating the relevant federal intraMTA rules, which the court has already concluded do not prohibit LECs from charging IXCs access charges on interstate wireless intraMTA calls. *See, e.g.,* Ps. Resp. 47 (citing Georgia tariff with the following parenthetical: "(incorporating the federal intraMTA regulations into the tariff).").

Verizon Compl. ¶¶ 71-73 (paragraph numbers omitted).[14]  These broad allegations could be interpreted to plead that intrastate intraMTA calls "do not qualify for such charges" because they are prohibited by federal law, by state law, or by filed state tariffs.  But without additional detail that enables the court to reasonably infer *why* plaintiffs allege that these calls do not "qualify" for access charges, and without pleading any specific provision of state law, federal law, or a specific filed state tariff that the charges allegedly violate, plaintiffs have failed to plead a facially plausible claim.

Accordingly, the court grants defendants' motion to dismiss plaintiffs' state-law claims.

## VII

Because the court concludes that the filed rate doctrine bars plaintiffs' federal-law claims and that plaintiffs have failed to plead facially plausible state-law claims, it need not reach defendants' other arguments in support of dismissal: that if defendants' tariffs do not apply, then state contract law—the "voluntary payment doctrine"—bars plaintiffs' claims; and that the federal two-year statute of limitations applies to plaintiffs' state-law claims.[15]

_____

[14]In the Sprint and Verizon complaints—which are representative, Ps. Resp. 3—plaintiffs plead state-specific and LEC-specific breach of contract claims.  All of the state-law breach claims in the Sprint and Verizon complaints, however, follow the same format and incorporate language nearly identical to the example set forth here.

[15]Nor need the court consider defendants' alternative contention that the court should refer the issues to the FCC under the primary jurisdiction doctrine.

VIII

AT&T has advised the court by notice that it does not join defendants' joint motion to dismiss.  It moves separately under Rule 12(b)(6) to dismiss or stay the two cases in which it is a named defendant[16] based on the doctrine of primary jurisdiction, pending a referral to the FCC.[17]

"The doctrine of primary jurisdiction attempts to maintain 'proper relationships between the courts and administrative agencies' by suspending judicial process pending the 'referral' of certain issues to an administrative agency for its views."  *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 809 (5th Cir. 2011) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956)).  Primary jurisdiction "applies where a claim is originally cognizable

---

[16]The cases are Nos. 3:14-CV-4571-D and 3:15-CV-0035-D.

[17]In a footnote, AT&T distinguishes its capacity as an IXC from its capacity as a LEC in the two cases in which its motion is filed.  It explains that it is a separate corporate entity from the other AT&T entities participating in these MDL proceedings, but is affiliated with those AT&T entities.

> In the above-captioned cases, AT&T Corp. is named as a defendant in its capacity as a local exchange carrier ("LEC") that provides certain switched access services.  AT&T Corp. also provides long distance services as an interexchange carrier ("IXC").  AT&T Corp. is a separate corporate entity from the other AT&T entities participating in this MDL proceeding, but is affiliated with those other AT&T entities. The other AT&T entities are generally incumbent LECs, and do not offer long distance services. AT&T Corp. and the other AT&T entities have each engaged separate outside counsel.

AT&T Mot. 1 n.1.

in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[.]" *W. Pac. R.R.*, 352 U.S. at 63-64 (quoting *Gen. Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433 (1940)).  Although "[n]o fixed formula exists," agency referral is favored when "(a) it will promote even-handed treatment and uniformity in a highly regulated area, or when sporadic action by federal courts would disrupt an agency's delicate regulatory scheme; or (b) the agency possesses expertise in a specialized area with which the courts are relatively unfamiliar." *Elam*, 635 F.3d at 811 (alteration in original) (citing *W. Pac. R.R.*, 352 U.S. at 64, and *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1092 (5th Cir. 1973)).  But "the doctrine of primary jurisdiction is not a doctrine of futility."  *Id.* (quoting *Local Union No. 189, Amalgamated Meat Cutters, & Butcher Workmen of N. Am., AFL-CIO v. Jewel Tea Co.*, 381 U.S. 676, 686 (1965)).  The court need not refer a matter to "'an expensive and merely delaying administrative proceeding' when there are no substantial issues for the agency to decide."  *Id.* (quoting *Jewel Tea*, 381 U.S. at 686).

     For the reasons explained above, the court holds that defendants are entitled to rely on the filed rate doctrine because it is lawful under federal law to charge IXCs access fees for access services that the LECs provide to enable the IXCs to exchange interstate wireless intraMTA calls.  The authority in place in 1996 for LECs to charge access fees for such services has not been explicitly superseded by FCC regulation.  Accordingly, there are no substantial issues for the FCC to decide.

IX

Although the court is granting defendants' joint motion to dismiss, it will permit plaintiffs to replead their state-law claims. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (citation omitted) (MDL proceedings). In this case, the defects in plaintiffs' federal-law claims are incurable: these claims are barred by the filed rate doctrine regardless how plaintiffs replead, because LECs are permitted under federal law to charge IXCs access fees for the access services at issue. But the court cannot say that the defects in plaintiffs' state-law claims are similarly incurable. For example, in support of their state-law claims, plaintiffs maintain in their response that a number of defendants' state tariffs expressly prohibit access charges for intraMTA calls. Plaintiffs may therefore be able to plausibly allege a state-law claim, at least on the basis that a specific state law or a filed state tariff actually prohibits the defendant LEC from charging IXCs access charges for the intrastate intraMTA calls at issue.

Accordingly, within 28 days of the date this memorandum opinion and order is filed, plaintiffs may file amended complaints that replead their state-law claims.[18]

---

[18]For cause, or by agreement of the parties and with court approval, the court will extend the deadline for plaintiffs to replead.

*   *   *

For the reasons explained, defendants' joint motion to dismiss is granted.  Plaintiffs' federal-law claims are dismissed with prejudice.  Plaintiffs'  state-law claims are dismissed, but plaintiffs are granted leave to replead their state-law claims.  AT&T's motion to dismiss on primary jurisdiction grounds, or, in the alternative, for stay pending referral is denied.

**SO ORDERED**.

November 17, 2015.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE